FILED

NOV 01 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP No.   12-1269-JuKiD |
| | ) | |
| JAMES LARRY SACCHERI and | ) | Bk. No.   09-17721 |
| JUDITH ANNE SACCHERI, | ) | |
| | ) | Adv. No. 09-1273 |
| Debtors. | ) | |
| _____ | ) | |
| JAMES LARRY SACCHERI, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | M E M O R A N D U M* |
| | ) | |
| ST. LAWRENCE VALLEY DAIRY; | ) | |
| JUDITH ANNE SACCHERI, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on October 19, 2012
at Sacramento, California

Filed - November 1, 2012

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable Richard T. Ford, Bankruptcy Judge, Presiding
_____

Appearances:    Appellant James Larry Saccheri argued pro se;
Jeff Reich, Esq. argued for appellee St. Lawrence
Valley Dairy.
_____

Before:  JURY, KIRSCHER, and DUNN Bankruptcy Judges.

_____

* This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

-1-

Chapter 7[1] debtor, James Larry Saccheri ("Saccheri" or "Debtor"), appeals from the bankruptcy court's judgment in favor of appellee, St. Lawrence Valley Dairy, Inc. (the "Dairy"), finding that his debt in the amount of $492,006.67 plus attorneys' fees of $59,382.50 and costs of $2,737.50 was nondischargeable under § 523(a)(2)(A) and (4).

We AFFIRM the bankruptcy court's decision finding that the debt was nondischargeable under § 523(a)(2)(A) and (a)(4)(embezzlement), except for the award of attorneys' fees which we REVERSE. We remand this proceeding to the bankruptcy court for entry of judgment consistent with this disposition.

## I. FACTS

### A. Prepetition Events

Saccheri, an attorney,[2] approached his friends and clients to invest in a dairy farm located in Chateaugay, New York. One of the investors, Michael J. Montgomery ("Montgomery"), was a distant family member of Saccheri and Saccheri's client for almost twenty years.[3] The other investors, James and Joan Kozera, had known Saccheri since grade school and were also

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] Saccheri resigned from the California State Bar in April 2001 with charges pending.

[3] Montgomery was also a farmer and real estate investor. He testified that he owned approximately 135 income properties consisting of single family residences, commercial buildings and apartment buildings. Montgomery invested $480,000 in the Dairy.

-2-

former clients.[4] Montgomery and the Kozeras did not want to invest in the Dairy if loans were involved.

From September 4, 2003 until November 24, 2003, Saccheri was the sole officer and director of the Dairy. On November 24, 2003, Montgomery became the secretary/treasurer. On April 12, 2004, at the Dairy's first annual meeting of shareholders and directors, Montgomery, James Kozera, Joan Kozera and Saccheri were elected to the board of directors. Saccheri was elected president, Montgomery was elected secretary/treasurer, Mr. Kozera was elected vice-president and Mrs. Kozera was a director. The officers and directors remained the same until December 27, 2007.

At all times, Saccheri had control of the Dairy's bank accounts and he alone kept the company's books and prepared the financial statements. Over time, Saccheri began taking substantial sums of money from the Dairy in the form of "loans" without board approval and which far exceeded his annual compensation of $30,000.[5] These "loans" were capitalized as "other assets" on the Dairy's balance sheet with a line item entitled "North Country Trust" or "NC Trust".

In 2007, Montgomery became aware that he had signed papers for an unauthorized secured loan arranged by Saccheri in the

---

[4] There were other investors as well. Saccheri testified that his sister, Janice, and her husband invested $20,000. The record also shows that Dr. Lee invested in the Dairy. Dr. Lee's shares were bought back for $50,000 (500 shares at $100 a share).

[5] Saccheri disputes the bankruptcy court's factual finding that his salary was $30,000. As noted below, we do not find any of the court's factual findings clearly erroneous.

-3-

amount of $350,000 from Yankee Farm Credit to the Dairy. Montgomery received a letter from the bank stating that the property taxes were not being paid on the property in New York, which was a requirement of the loan.

Also in 2007, Montgomery further learned about Saccheri's self-dealings and concealment of the financial condition of the Dairy through his trust attorney, Paul Franco, who had reviewed the Dairy's records. Saccheri's self-dealings included, among other things, obtaining the unauthorized secured loan from Yankee Farm Credit and his use of the Dairy's money to pay personal expenses, including payments on his house and for health insurance. Montgomery also learned from his trust attorney that he had personally guaranteed the $350,000 Yankee Farm Credit loan by signing a document without reading it.

Montgomery called a meeting at Mr. Franco's office. The Kozeras, Montgomery, Saccheri and others attended. After they left the meeting, the board members realized that Saccheri alone was preparing the financial statements and doing the bookkeeping for the Dairy. They agreed that a CPA should be hired. At a subsequent meeting, after Saccheri failed to bring in an accountant, Saccheri resigned.

Subsequently, Mrs. Kozera and Mr. Ezell, the CPA, discussed money going in and out of the Dairy's bank account to other bank accounts the board members knew nothing about. They discovered that Saccheri had written checks from the Dairy to pay back funds to the Palmira Marando Trust, which was maintained for Montgomery's grandmother. Saccheri had taken funds from the

trust in his role as trustee.[6]  They also discovered that Saccheri had written unauthorized checks totaling $152,400.44 from the Dairy to the Trenhaile Estate.  At an April 1, 2008, shareholder meeting, when Saccheri was asked why he took the money from the Dairy, Saccheri replied that he was in debt from his declining law practice 1995 to 2000.  Then from 2000 to 2004 he stated that he accumulated even more personal consumer debt.

On June 25, 2008, the parties entered into a settlement and release agreement ("Settlement Agreement") whereby they settled the claims for $375,000.  In connection with the Settlement Agreement, Saccheri signed an unsecured promissory note for $299,000 and a second note for $76,000 which was secured by a deed of trust on Saccheri's family home.  Under the terms of the settlement, if Saccheri was not in default, the Dairy agreed not to pursue any action at law or equity against him.  The Settlement Agreement contained an attorneys' fees clause which stated that the losing party shall pay the prevailing party a reasonable sum for attorneys' fees incurred in bringing an action for the purpose of enforcing this Settlement Agreement or pursuing a breach thereof.

Saccheri made only a few payments on the notes before defaulting.

**B.    Bankruptcy Events**

On August 12, 2009, Saccheri and his wife Judith filed a joint chapter 7 petition.  In Schedule D, debtors listed the

---

[6] Saccheri admitted that he wrote twenty-eight checks to the Palmira Marando Trust totaling $81,525.

-5-

Dairy as having a secured debt in the amount of $75,597 against their residence. In Schedule F, debtors listed the Dairy as having an unsecured debt in the amount of $297,416.

**The Adversary Proceeding**

On November 9, 2009, the Dairy filed a nondischargeability complaint against Debtor for an unliquidated amount. On June 25, 2010, the Dairy filed a third amended complaint ("TAC"). The TAC alleged four claims for relief, with the first three claims asserted against Debtor and the fourth claim asserted against Judith. The first and second claims for relief were based on § 523(a)(4) and alleged that Debtor had committed fraud or defalcation while acting in a fiduciary capacity and embezzlement. The third claim for relief, based on § 523(a)(2)(A), alleged that Debtor had obtained money and goods by false pretenses, false representation and actual fraud. The facts underlying each of the claims for relief were essentially the same and related to the numerous unauthorized "loans" Debtor had taken from the Dairy and his concealment of those "loans" from the other board members.

The fourth claim for relief, asserted against Judith only, was based on § 523(a)(6). The bankruptcy court dismissed the claim against Judith on summary judgment.

On April 6, 2011, the bankruptcy court held a final pre-trial hearing and bifurcated the trial into liability and damage phases. The court set a trial for the liability phase on May 9 and 10, 2011. At the conclusion of the trial the matter was submitted to allow for further findings and briefs.

On June 29, 2011, the bankruptcy court issued its findings

of fact and conclusions of law. The bankruptcy court found that the Dairy had proven all the elements for embezzlement under § 523(a)(4), for defalcation while acting as fiduciary under § 523(a)(4) and for fraud under § 523(a)(2)(A). Based on these conclusions, the court found that the debt in an unspecified amount was nondischargeable.

On July 18, 2011, the Dairy filed a fourth amended complaint which restated its TAC and added a fifth claim for relief requesting a declaration that Judith's community property interest was liable for the nondischargeable debt attributed to her spouse.

The damage phase proceeded to trial on November 29 and 30, and December 1, 2011. On April 6, 2012, the bankruptcy court issued additional findings of fact and conclusions of law. In a forty-four line item chart which listed various checks and transactions, certain amounts were charged against Saccheri, credited or disallowed. The court addressed each of the items, ultimately finding the total nondischargeable amount was $399,131.35. The court also found that the Dairy, as the prevailing party, was entitled to its attorneys' fees and costs under the terms of the Settlement Agreement. In its conclusions of law, the bankruptcy court found that Judith's community assets were liable for the damages. Also, due to Debtor's fraudulent conduct, the bankruptcy court applied the doctrine of unclean hands and found Debtor was not entitled to the benefit of doubt on the issues of damages. The bankruptcy court noted that Debtor had deceived people who had trusted him over a substantial period of time.

-7-

The Dairy then submitted its application for attorneys' fees and costs seeking $59,382.50 in fees and $2,737.50 in costs for a total of $62,120. The Dairy attached detailed time records to the application.

On May 2, 2012, Debtor filed an opposition to the fee application. Relying on Itule v. Metlease, Inc. (In re Itule), 114 B.R. 206, 213 (9th Cir. BAP 1990); Grove v. Fulwiler (In re Fulwiler), 624 F.2d 908, 910 (9th Cir. 1980); and AT&T Universal Card Servs. v. Bonnifield (In re Bonnifield), 154 B.R. 743, 745 (Bankr. N.D. Cal. 1993), Debtor argued that the attorneys' fees and costs should not be awarded because the attorneys' fees provision in the Settlement Agreement was conditioned on an action that was brought for the purpose of enforcing the agreement or pursuing a breach thereof. Debtor asserted that the Dairy was not seeking to enforce the Settlement Agreement or the notes in the adversary, instead choosing to litigate issues related to fraud, not contract. Debtor also objected to the amount of fees requested because they were unreasonable.

In reply, the Dairy argued that the adversary was "simply the enforcement of the subject Settlement Agreement. In such matters, attorney[s]' fees are permissible." The Dairy, citing Transought v. Johnson, 931 F.2d 1505 (11th Cir. 1991), asserted the general rule that attorneys' fees are properly awarded to a creditor prevailing on a bankruptcy claim if there exists a statute or valid contract authorizing the fees.

On May 7, 2012, the bankruptcy court issued further findings of fact and conclusions of law. The court found that

the amount of damages listed as $399,131.35 was incorrect. The bankruptcy court noted that the correct amount of damages was $492,006.57. Citing Fleishmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717 (1967), the bankruptcy court noted that attorneys' fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing for such fees. The court concluded that the Settlement Agreement clearly provided for allowance of attorneys' fees. The court also observed that Cal. Code Civ. P. § 1021 provided for attorneys' fees by agreement, express or implied. In the end, the bankruptcy court decided that the requested fees were reasonable and awarded them in full.

On May 7, 2012, the bankruptcy court filed the judgment finding $492,006.57 plus attorneys' fees of $59,382.50 and costs of $2,737.50 nondischargeable under § 523(a)(2)(A) and (4). On May 8, 2012, the bankruptcy court entered the judgment. Debtor timely filed a notice of appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

A. Whether the bankruptcy court erred in concluding that the Dairy proved the elements for nondischargeability under § 523(a)(2)(A);

B. Whether the bankruptcy court erred in concluding that the Dairy proved the elements for embezzlement under § 523(a)(4);

-9-

C.   Whether the bankruptcy court erred in finding that Debtor was a fiduciary within the meaning of § 523(a)(4);

D.   Whether the bankruptcy court erred in its calculation of damages; and

E.   Whether the bankruptcy court erred in awarding the Dairy its attorneys' fees.[7]

## IV.   STANDARDS OF REVIEW

In the context of an appeal from a nondischargeability judgment, we review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo.  Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 382 (9th Cir. BAP 2011).  However, the ultimate question of whether a particular debt is dischargeable is a mixed question of fact and law that we review de novo.  Id.; see also Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004) (stating that mixed questions are reviewed de novo when they require the court "to consider legal concepts and exercise judgment about values animating legal principles.").

"The determination of justifiable reliance [under § 523(a)(2)(A)] is a question of fact subject to the clearly erroneous standard of review."  Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh), 973 F.2d 1454, 1456 (9th Cir. 1992) (per curiam).

The bankruptcy court's factual findings regarding the

---

[7] Debtor lists twenty-one issues for purposes of this appeal.  The majority of the issues pertain to the bankruptcy court's factual findings, most of which relate to the court's calculation of damages.  We address Debtor's factual errors arguments below.

amount of damages are also reviewed under a clearly erroneous standard. Lundell v. Ulrich (In re Ulrich), 236 B.R. 720, 723 (9th Cir. BAP 1999).

A bankruptcy court's factual findings are clearly erroneous if they are illogical, implausible, or without support from inferences that may be drawn from the record. United States v. Hinkson, 585 F.3d 1247, 1259-61 (9th Cir. 2009) (en banc). It is well settled that "review under the 'clearly erroneous standard' is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993). We are required to uphold any determination of the bankruptcy court that falls within a broad range of permissible conclusions. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400 (1990).

The issue of whether a relationship is "fiduciary" within the meaning of § 532(a)(4) is a question of law, Runnion v. Pedrazzini (In re Pedrazzini), 644 F.2d 756, 758 (9th Cir. 1981), which we review de novo. Ragsdale v. Haller, 780 F.2d 794 (9th Cir. 1986).

We review the bankruptcy court's evidentiary rulings for abuse of discretion. See Johnson v. Neilson (In re Slatkin), 525 F.3d 805, 811 (9th Cir. 2008). We also "review for abuse of discretion the bankruptcy court's award of prejudgment interest, but review de novo whether an award of prejudgment interest is authorized under state or federal law." Id. at 820.

Under the abuse of discretion standard of review, we first "determine de novo whether the [bankruptcy] court identified the

-11-

correct legal rule to apply to the relief requested." Hinkson, 585 F.3d at 1262. And if the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were illogical, implausible, or without support in inferences that may be drawn from the facts in the record. Id.

"Awards of attorney[s'] fees are generally reviewed for an abuse of discretion. However, we only arrive at discretionary review if we are satisfied that the correct legal standard was applied and that none of the [bankruptcy court's] findings of fact were clearly erroneous. We review questions of law de novo." Rickley v. Cnty. of L.A., 654 F.3d 950, 953 (9th Cir. 2011). To the extent the issue is whether California law allows the award of attorneys' fees, our review is de novo. Fry v. Dinan (In re Dinan), 448 B.R. 775, 783 (9th Cir. BAP 2011).

## V. DISCUSSION

On appeal, Debtor argues that the bankruptcy court erred in concluding that the debt owed to the Dairy was nondischargeable under § 523(a)(2)(A) and (4) due to mistakes of fact and law. Debtor alleges numerous factual errors, contending that the bankruptcy court improperly found the element of justifiable reliance was met under § 523(a)(2)(A) and charged or failed to give him credit for certain amounts when it calculated the damage award. Debtor also asserts that he was not a fiduciary within the meaning of § 523(a)(4). Finally, Debtor contends that the bankruptcy court erred in awarding attorneys' fees to the Dairy because the issues litigated in the adversary

-12-

proceeding fell outside the scope of the attorneys' fee clause in the Settlement Agreement.

Before addressing Debtor's contentions of law, we address his asserted factual errors which are listed under his issues on appeal. As appellant, Debtor had the "responsibility to file an adequate record, and the burden of showing that the bankruptcy court's findings of fact are clearly erroneous. [Debtor] should know that an attempt to reverse the trial court's findings of fact will require the entire record relied upon by the trial court be supplied for review." Kritt v. Kritt (In re Kritt), 190 B.R. 382, 387 (9th Cir. BAP 1995) (citing Burkhart v. FDIC (In re Burkhart), 84 B.R. 658, 660-61 (9th Cir. BAP 1988)).

Debtor has provided us with only select portions of the relevant transcripts. Moreover, Debtor refers to trial exhibits which are ostensibly included under Tab Y; however, the documents under Tab Y do not have exhibit numbers on them, making it nearly impossible for us to match the exhibits with testimony. To compound the problem, it does not appear that Debtor included all the exhibits from trial in the record. Due to the incomplete record, effective appellate review of factual errors under the clearly erroneous standard will be difficult if not impossible.[8]

"The settled rule on transcripts in particular is that

---

[8] BAP Rule 8006-1 provides: "The excerpts of the record shall include the transcripts necessary for adequate review in light of the standard of review to be applied to the issues before the Panel. The Panel is required to consider only those portions of the transcript included in the excerpts of the record . . . ."

failure to provide a sufficient transcript may, but need not, result in dismissal or summary affirmance and that the appellate court has discretion to disregard the defect and decide the appeal on the merits." Kyle v. Dye (In re Kyle), 317 B.R. 390, 393-94 (9th Cir. BAP 2004), aff'd, 170 Fed.Appx. 457 (9th Cir. 2006). Having obtained the partial transcripts and some exhibits, although unnumbered, we exercise our discretion to review Debtor's alleged factual errors on the merits.

We first observe that Debtor failed to match the majority of the asserted factual errors with any of the elements under § 523(a)(2)(A) or (a)(4). Indeed, the only element Debtor discusses in his brief pertaining to § 523(a)(2)(A) is justifiable reliance, which we address below. From what we can tell, some of the factual errors alleged relate to the nature and extent of Debtor's fraudulent conduct.

Specifically, Debtor contends that the bankruptcy court erroneously found his compensation was $30,000 per year[9] when he testified that his compensation package was later modified with board approval to include management fees, health insurance, and other expenses. Hr'g Tr. at 315-17, 5/10/11. However, the bankruptcy court did not believe Debtor's testimony regarding his modified compensation package and there was no written evidence to support his testimony.

Debtor also takes issue with the bankruptcy court's factual

_____

[9] James Kozera testified that the directors allowed this salary although it was never discussed. Kozera also testified that this salary had not changed. Hr'g Tr. at 152, 162-63, 5/9/11. Montgomery testified that he remembered Debtor's annual compensation as $32,000. Hr'g Tr. at 91, 5/9/11.

-14-

finding that Montgomery and the other directors were not aware of the $350,000 loan between the Dairy and Yankee Farm Credit until 2007. The record shows there were numerous documents pertaining to the loan, including a guarantee by Montgomery, that Montgomery signed. Montgomery testified that he did not read or understand the documentation that he signed authorizing the $350,000 loan and did not learn about it until he received the letter from Yankee Farm Credit that the taxes were not being paid on the property. Debtor contends that Montgomery's testimony should not have been believed because Montgomery was an educated man and experienced buyer of real estate. Debtor maintains that Montgomery's testimony is "beyond the realm of possibility."

The record shows that the bankruptcy court found otherwise based on the relationship between Debtor and Montgomery. Montgomery testified that he trusted Debtor and that he did not read legal papers, instead referring them to Debtor, his attorney for twenty years. The court found Montgomery's testimony believable. The bankruptcy court also believed the testimony of the Kozeras that they did not know about the loan and would never have authorized it.

On this record we cannot say that the court's factual findings in connection with the board's discovery of the Yankee Farm Credit loan are illogical, implausible, or without support from inferences drawn from the record. Hinkson, 585 F.3d at 1259-61. In addition, findings based on determinations regarding the credibility of witnesses "demand[] even greater deference to the trial court's findings; for only the trial

-15-

judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985).

We also point out that the outcome of this appeal does not stand or fall on these alleged factual errors regarding Debtor's fraud. The record shows Debtor committed multiple frauds by writing unauthorized checks on the Dairy's bank account for his personal use none of which were evidenced by independent director approval, board authorization, or any directors' meeting minutes. Debtor admitted his liability on many of these unauthorized transactions: he admitted to borrowing $81,525 from the Dairy to repay monies that he had taken from the Palmira Marando Trust,[10] to taking unauthorized ATM charges of $61,444.63 (with an offset of $1,531.48), to making payments on his home totaling $34,418.52, and he did not dispute charges against him for the 2004 checks totaling $60,530.78, the 2005 checks totaling $72,300, the 2006 checks totaling $42,850, and the 2007 checks totaling $44,625. Thus, there is ample evidence to show Debtor engaged in fraud and a continuing course of deceptive conduct.

Debtor asserts numerous factual errors with respect to the bankruptcy court's calculation of damages. Again, the record

---

[10] In addition, the record shows that Debtor was not authorized to borrow $152,504.44 from the Dairy to repay monies he had taken from the Trenhaile Estate. Although Debtor testified that he was authorized to borrow the money for the repayment to the Trenhaile Estate, the bankruptcy court did not find his testimony believable nor was there any documentation to support his contentions.

-16-

reveals that Debtor submitted no corporate minutes or other writings conclusively establishing that he had obtained authorization from any director or the board for the transactions involved in this appeal.[11] The lack of documentation made it difficult for the bankruptcy court to evaluate the numerous alleged charges and credits and calculate the damages with any type of precision.

> Where a 'defendant by his own wrong has prevented a more precise computation . . . [the factfinder] may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.'

In re Ulrich, 236 B.R. at 723. In the end, Debtor's financial machinations coupled with the lack of documentation were a major problem for him, especially in light of the fact that he was an attorney who had practiced law for decades. The bankruptcy court found "[b]y education and by professional experience as an

---

[11] The bankruptcy court found there was no "clear evidence" to support Debtor's contention that he should receive $10,000 credit for the purchase of the Dairy's stock. The bankruptcy court also requested documentation showing that Debtor was entitled to a credit of the dividends that he received on stock that he never validly purchased. The record shows that Debtor never pointed to any documentation regarding this credit. With respect to the charges for Dr. Lee, the record shows that Debtor never explained why Dr. Lee would "loan" money to the Dairy nor did he provide any documentation to support such a loan. Likewise, with Debtor's remaining challenges to the bankruptcy court's factual findings on damages, Debtor points to no documents in the record that would support his testimony or asserted errors on appeal.

attorney, Defendant was well aware that he should document everything, especially when involved in self-dealing efforts, he did not."

Without conclusive documentation, the bankruptcy court was not compelled to believe Debtor's self-serving testimony, which in most instances, the court did not find credible. We do not disturb the "quintessentially factual determination" of credibility "in the absence of clear error." United States v. Lummi Indian Tribe, 841 F.2d 317, 319 (9th Cir. 1988). Debtor has pointed to no evidence in the record that suggests the bankruptcy court's assessments of witness credibility were so blatantly wrong as to require reversal.

Moreover, under the doctrine of unclean hands, Debtor must come into court with clean hands or he will be denied relief, regardless of the merits of his claim. Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814-15 (1945); Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 350 (9th Cir. 1963) (plaintiff's unclean hands weigh in the equitable balance that underlies the design of a remedy). Here, the bankruptcy court applied the doctrine of unclean hands finding that Debtor was not entitled to the benefit of doubt regarding the charges or credits with respect to the calculation of the damages because he had deceived people who had trusted him over a substantial period of time.[12]

---

[12] Generally, the application of the equitable doctrine of unclean hands is within the discretion of the trial court and is reviewed for abuse of that discretion. See TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc., 913 F.2d 676, 694 (9th Cir.
(continued...)

-18-

On this record, we conclude that the bankruptcy court's factual findings Debtor challenges on appeal fell within the broad range of permissible conclusions. <u>Cooter & Gell</u>, 496 U.S. at 400. Therefore, the bankruptcy court's factual findings were not clearly erroneous.

**A. Debtor's Liability Under § 523(a)(2)(A)**

To establish that a debt is nondischargeable under § 523(a)(2)(A), a creditor must establish five elements: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. <u>Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)</u>, 234 F.3d 1081, 1085 (9th Cir. 2000). The Dairy had the burden of proving the various elements by a preponderance of the evidence. <u>Id.</u> "The burden of showing something by a 'preponderance of the evidence,' . . . 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the

---

[12](...continued)
1990). Debtor does not raise any issue with respect to the court's application of the doctrine on appeal. Nonetheless, we mention the court's application of the doctrine because it clearly relates to the court's credibility assessment of Debtor's testimony on damages. Findings based on determinations regarding the credibility of witnesses "demand[] even greater deference to the trial court's findings . . . ." <u>Anderson</u>, 470 U.S. at 575.

fact's existence.'" Concrete Pipe & Prods. of Cal., Inc., 508 U.S. at 622.

**Debtor's Fraud**

As described above, Debtor's deceptive conduct amounted to multiple frauds, some of which he admitted.

**Knowledge and Intent to Deceive**

Debtor does not identify errors of fact or law with any degree of specificity regarding the elements of knowledge and intent to deceive. Rather, Debtor makes a blanket statement that the bankruptcy court's conclusion that Debtor was liable under § 523(a)(2)(A) was erroneous. To the extent Debtor's assignment of error is directed at the knowledge and intent to deceive elements, we reject it.

Debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from Debtor's conduct. Edelson v. Comm'r, 829 F.2d 828, 832 (9th Cir. 1987) ("A court may infer fraudulent intent from various kinds of circumstantial evidence."); Donaldson v. Hayes (In re Ortenzo Hayes), 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004) ("Knowledge may be proven by circumstantial evidence and inferred from the debtor's course of conduct.").

Here, the bankruptcy court found numerous transactions by the Debtor with the Dairy were unauthorized by the board. The court further found that during Debtor's tenure as president, he prepared all of the financial books and records of the Dairy, had control of the checkbooks, and concealed the unauthorized "loans" under the NC Trust. In addition, the bankruptcy court observed that Debtor had been an attorney for over twenty years,

-20-

and as an experienced attorney, he would have known the importance of documenting financial arrangements with others. Yet, Debtor did not document any of the loans he allegedly received from plaintiff.

These factual findings are not independent of each other but show a continuing pattern of wrongful conduct. Therefore, the bankruptcy court could reasonably infer that Debtor had knowledge of his deceptive conduct and the intent to deceive.

**The Directors' Justifiable Reliance**

Debtor argues that the bankruptcy court erred in finding that the Kozeras and Montgomery justifiably relied on Debtor's misrepresentations and/or deceptive conduct. The bankruptcy court found that the directors had no reason not to believe Debtor. The court properly considered that Debtor had been both the Kozeras' and Montgomery's attorney for years and their trusted friend. See In re Kirsch, 973 F.2d at 1458 ("In considering whether reliance is justifiable, the court must take into account 'the knowledge and relationship of the parties.'"). In addition, the bankruptcy court found that the financial documents "all looked good" as they were made to conceal the money that Debtor had been taking through the line item on the balance sheet showing his alleged "loans" as "other assets" under what he called North Country Trust or NC Trust. The NC Trust supposedly held money that the Dairy had not expended, but it actually reflected the money Debtor had taken from the Dairy in unauthorized "loans."

Debtor contends the bankruptcy court erred in finding that the Dairy justifiably relied on his misrepresentations because

the statute of limitations on the Dairy's fraud claims had expired by June 30, 2007.[13]  Debtor argues that by June 30, 2004, when Montgomery had finished signing all the loan documents, the Dairy knew or should have known or should have discovered the facts on which the Dairy bases it claims for relief.

We are not persuaded by Debtor's statute of limitations defense.  First, the only place we see the statute of limitations mentioned is in Debtor's answer to the TAC.  It does not appear from the record that Debtor argued the issue at trial in the bankruptcy court.  See Barnes v. Belice (In re Belice), 461 B.R. 564, 569 n.4 (9th Cir. BAP 2011) (holding that arguments not raised in the bankruptcy court can be deemed waived for appeal purposes).

Second, under California law, the Dairy's cause of action for fraud did not "accrue[ ] until the discovery . . . of the facts constituting the fraud or mistake."  Cal. Code Civ. P. § 338(d).  As noted above, the bankruptcy court believed Montgomery that he did not learn of the Debtor's fraud until 2007 when he received the letter from Yankee Farm Credit stating that the property taxes were not being paid on the property in New York.

Third, Debtor limits the "discovery" of his fraud as relating only to the unauthorized $350,000 Yankee Farm Credit loan.  However, Debtor obtained numerous other unauthorized "loans" from the Dairy which the record shows were discovered by

---

[13] Since the gravamen of the Dairy's complaint is based on fraud, California's three year statute of limitation under Cal. Code Civ. P. § 338 would apply.

-22-

the Kozeras and Montgomery only after the CPA they hired examined the Dairy's books and records.

For these reasons, we conclude that the bankruptcy court's finding on the justifiable reliance element was not clearly erroneous.

**Damages**

As noted, the record supports the bankruptcy court's factual findings regarding an award of damages.  We discuss the bankruptcy court's award of prejudgment interest and attorneys' fees in further detail below.

In sum, on the record provided, we discern no error with the bankruptcy court's conclusion that the Dairy had proved all the elements for § 523(a)(2)(A) by a preponderance of the evidence.

**B.   Debtor's Liability Under Section 523(a)(4)**

Section 523(a)(4) prohibits the discharge of debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

The elements for embezzlement are (1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than that for which it was entrusted; and (3) circumstances indicating fraud.  <u>Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)</u>, 942 F.2d 551, 555 (9th Cir. 1991).  Again, Debtor does not address errors of fact or law specifically related to these elements in his briefs.

The bankruptcy court found that the Dairy's money was rightfully in the possession of Debtor, but then he

-23-

"appropriated it to his own use by spending it or paying his bills and obligations which was not known or authorized by the Plaintiffs . . . and it was done with a fraudulent intent." The record amply supports the bankruptcy court's findings of fact and conclusions of law regarding the elements for embezzlement. Therefore, we do not disturb the court's decision on appeal.

To prevail on a claim arising from "fraud or defalcation while acting in a fiduciary capacity", the creditor must prove not only the debtor's fraud or defalcation, but also that the debtor was acting in a fiduciary capacity when the debtor committed the fraud or defalcation. Citing the Fifth Circuit case of Moreno v. Ashworth (In re Moreno), 892 F.2d 417 (5th Cir. 1990), the bankruptcy court found Debtor was acting as a fiduciary because he was the president of a private corporation entrusted with funds for a particular purpose. On appeal, Debtor maintains that he was not a fiduciary for purposes of § 523(a)(4) citing Cal-Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125-1128 (9th Cir. 2003). We agree that the holding in Cantrell applies to these facts.

In Cantrell, the Ninth Circuit reiterated that the term "fiduciary" is construed narrowly for purposes of § 523(a)(4). Id. at 1125. Under this narrow construction, the fiduciary relationship must arise from an express or technical trust. Id. ("'The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context.") (citing Ragsdale v. Haller (In re Haller), 780 F.2d 794, 796 (9th Cir. 1986)).

Bankruptcy courts look to state law to determine whether an

-24-

express trust relationship exists. In re Cantrell, 329 F.3d at 1125. Under California corporations law, corporate officers and directors are not fiduciaries within the meaning of § 523(a)(4). Id. at 1127. The Cantrell court explained, "although officers and directors [under California law] are imbued with the fiduciary duties of an agent and certain duties of a trustee, they are not trustees with respect to corporate assets." Id. at 1126 (emphasis added). Cantrell relied on Bainbridge v. Stoner, 106 P.2d 423 (Cal. 1940), which explicitly held that the relationship in California between a director on the one hand and the corporation and its shareholders on the other hand, strictly speaking, was one of agency and not trust. In re Cantrell, 329 F.3d at 1126 (citing Bainbridge, 106 P.2d at 426).

The Dairy recognizes that California law draws a distinction between the fiduciary duties of corporate officers and directors who are viewed as agents and the fiduciary duties of a trustee. Nonetheless, the Dairy argues that Debtor was a trustee because he was entrusted with the bank accounts of the Dairy and had virtually "unlimited sway over them." We are not persuaded. In the Fifth Circuit case of In re Moreno, the debtor, an officer, did not dispute that he was a fiduciary under Texas law which is inapposite to California law. In re Moreno, 892 F.2d at 421. Moreover, although Debtor was in a relationship with the board members that involved confidence, trust and good faith, this general definition of fiduciary is inapplicable in the dischargeability context. Accordingly, we conclude that the bankruptcy court erred in finding that Debtor

-25-

was a fiduciary within the meaning of § 523(a)(4).

However, because the court's embezzlement finding was correct, the bankruptcy court's conclusion that the damages were nondischargeable under § 523(a)(4) will not be disturbed on appeal.

**C.    Other Damages**

**Prejudgment Interest**

Debtor asserts that the bankruptcy court erred in charging him for interest in the amount of $47,464.22 on the promissory notes on two grounds:  first, Debtor maintains that there was no testimony to support how the Dairy calculated the interest on the notes and second, Debtor argues that the notes form a part of the Settlement Agreement and release and the Dairy did not state a claim for breach of the Settlement Agreement in the adversary proceeding, instead pursuing claims based on fraud.

In its findings, the bankruptcy court noted that it was reluctant to award the interest claims as set forth in the Settlement Agreement and two promissory notes but that there was no other way to compensate the Dairy for its loss of property and money except by allowing interest.  The court further found that since no other interest calculations were offered by either party, it "seems reasonable to allow the interest that the parties agreed upon in the [notes]."[14]

The award of prejudgment interest in nondischargeability

_____

[14] Although Debtor contends that there was no testimony to support how the Dairy calculated the interest on the notes, this argument cannot form a basis for reversal on appeal when we do not have the complete transcripts in the record.

proceedings is authorized under Cohen v. de la Cruz, 523 U.S. 213, 223 (1998), where the United States Supreme Court concluded that the text of § 523(a)(2)(A) "encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees and other relief that may exceed the value obtained by the debtor."

In awarding prejudgment interest, the bankruptcy court did not specifically state what law it was applying when it awarded the prejudgment interest. Under federal law, courts may allow prejudgment interest even though a governing statute is silent regarding such interest. Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 886 F.2d 1545, 1550 (9th Cir. 1989), cert. denied, 494 U.S. 1017 (1990). "[T]he award of prejudgment interest in a case under federal law is a matter left to the sound discretion of the trial court. Awards of prejudgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." Acequia Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800 (9th Cir. 1994) (determining that an award of prejudgment interest in a § 548(a) case is left to the sound discretion of the trial court and is awarded when necessary to make the wronged party whole).

Where a debt that is found to be nondischargeable arose under state law, "the award of prejudgment interest on that debt is also governed by state law." Otto v. Niles (In re Niles), 106 F.3d 1456, 1463 (9th Cir. 1997). Under California law, the court may award prejudgment interest in actions other than contract in its discretion. Cal. Civ. Code § 3288 ("In an

-27-

action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.").[15]

Here, the parties entered into a Settlement Agreement on June 25, 2008, agreeing that the Diary's claim against Debtor was $375,000. Since that time — and actually well before — the Debtor has had possession and use of the Dairy's money. Thus, the underlying purpose justifying an award of prejudgment interest is present — compensation to the Dairy for its loss of the use of its money that Debtor "loaned" himself without authorization. Additionally, because the parties did not offer any other interest calculations, the bankruptcy court found it "reasonable" to use the interest rate agreed to by the parties in the promissory notes. See Blau v. Lehman, 368 U.S. 403, 414 (1962) ("[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness"). Without contrary evidence, the bankruptcy court properly exercised its discretion by selecting

_____

[15] California law also provides that prejudgment interest is a matter of right where there is a vested right to recover "damages certain as of a particular day." Cal. Civil Code § 3287(a). "[T]he certainty requirement of [Civil Code] section 3287, subdivision (a) has been reduced to two tests: (1) whether the debtor knows the amount owed or (2) whether the debtor would be able to compute the damages." Fireman's Fund Ins. Co. v. Allstate Ins. Co., 234 Cal.App.3d 1154, 1173 (Cal. Ct. App. 1991). It is equally possible that the bankruptcy court was awarding prejudgment interest as a matter of right rather than by exercising its discretion. After all, the parties had liquidated the amount of damages owed in the Settlement Agreement. The fact that the amount may have later increased due to charges, credits or disallowances did not make the amount of the damages less certain.

the rate of interest set forth in the promissory notes.[16] Accordingly, we conclude that the bankruptcy court did not abuse its discretion in awarding the Dairy prejudgment interest.

**Attorneys' Fees and Costs**

Debtor contends that the bankruptcy court erred in awarding the Dairy attorneys' fees in this proceeding because the issues litigated were based on fraud and nondischargeability and thus not within the scope of the attorneys' fee provision in the Settlement Agreement. We agree.

Attorneys' fees may be awarded and declared nondischargeable in an action to determine dischargeability of debt. Cohen, 523 U.S. at 223. However, before attorneys' fees are awarded, two requirements must be met: (1) an underlying contract or nonbankruptcy law must provide a right to recover attorneys' fees, and (2) the issues litigated in the dischargeability action must fall within the scope of the contractual or statutory attorneys' fees provision. See In re Dinan, 448 B.R. at 785 (9th Cir. BAP 2011) ("under Cohen, the determinative question for awarding attorneys' fees is whether the creditor would be able to recover the fee outside of bankruptcy under state or federal law").

The Dairy contends that the award of attorneys' fees was appropriate and cites the Eleventh Circuit case Transouth, 931 F.2d 1505, which, in turn, cited Fleishmann Distilling Corp., 386 U.S. at 717, in support of its position. These cases

---

[16] If the trial court had selected the California Judgment rate of interest of 10%, the award would have been much higher.

simply stand for the proposition that attorneys' fees are properly awarded to a creditor prevailing on a bankruptcy claim if there exists a statute or valid contract that authorizes the fees. However, these cases do not address the remaining question for the award of attorneys' fees in nondischargeability actions: whether the issues litigated in the dischargeability action fall within the scope of the contractual or statutory attorneys' fees provision.

In the bankruptcy court, the Dairy asserted that the "present issue before the court is simply the enforcement of the subject Settlement Agreement. In such matters, attorney's fees are permissible." The Dairy distinguished the cases of In re Fulwiler, 624 F.2d 908, and In re Bonnifield, 154 B.R. 743, contending that in those cases "dischargeability was at issue" and not the enforcement of a Settlement Agreement. Exactly. The Dairy's claims in the nondischargeability proceeding were not brought to enforce the terms of the agreement or to pursue a breach. The Dairy did not plead that Debtor was liable under the Settlement Agreement nor did it litigate that Debtor had breached the agreement. Rather, the action pursued the remedy of nondischargeability based on the tort claims of fraud, breach of fiduciary duty and embezzlement for purposes of § 523(a)(2)(A) and (a)(4). Moreover, the attorneys' fees clause was in an agreement that was not even in existence at the time the acts which led to nondischargeability occurred. The adversary proceeding concerned those acts, not the Settlement Agreement. Therefore, the attorneys' fee clause in the agreement was inapplicable to the claims litigated.

Accordingly, we conclude that the bankruptcy court erred in awarding the attorneys' fees.

### VI.  CONCLUSION

For the reasons stated, we AFFIRM the bankruptcy court's decision finding that the debt was nondischargeable under § 523(a)(2) and (a)(4)(embezzlement), except for the award of attorneys' fees which we REVERSE.  We remand this proceeding to the bankruptcy court to enter a judgment consistent with this disposition.